**LEECIA WELCH**
**JOHN F. O'TOOLE**
NATIONAL CENTER FOR YOUTH LAW
405 14th Street, 15th Floor
Oakland, California 94612
(510) 835-8098

**STEPHEN C. CLARK (USB #4551)**
JONES, WALDO, HOLBROOK
&McDONOUGH
1500 First Interstate Plaza
170 South Main Street
Salt Lake City, Utah 84101
(801) 521-3200

**GREGORY P. DRESSER**
MORRISON, FOERSTER, LLP
425 Market Street
San Francisco, California 94105
(415) 268-7000
**ATTORNEYS FOR PLAINTIFFS**

**MARK L. SHURTLEFF (USB #4666)**
ATTORNEY GENERAL
**CRAIG L. BARLOW (USB #0213)**
**SUSAN EISENMAN (USB #6872)**
ASSISTANT ATTORNEYS GENERAL
FOR THE STATE OF UTAH
5272 South College Drive
Murray, Utah 84103
(801) 281-1234
**ATTORNEYS FOR DEFENDANTS**

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID C., *et al.*,<br><br>        Plaintiffs,<br>v.<br><br>JON HUNTSMAN, JR., *et al.*,<br><br>        Defendants | **AGREEMENT TO TERMINATE THE LAWSUIT**<br><br><br><br>**CIVIL NO: 2:93-CV-00206 TC**<br><br><br>JUDGE TENA CAMPBELL |

# PART I

The parties to this lawsuit, David C., *et al*. (hereinafter "Plaintiffs"); Jon Huntsman, in his official capacity as Governor of Utah; Lisa-Michele Church, in her official capacity as Executive Director of Utah's Department of Human Services (DHS); and Duane Betournay, in his official capacity as Director of DCFS (hereinafter "Defendants"), make the following agreements, acknowledgements, and stipulations by and through their counsel of record:

1.  Significant reforms to Utah's child welfare system have been achieved.

2.  Defendants have made significant progress in improving case practices and ensuring strong system performance such that implementation of and compliance with the policies and practices set forth below will constitute an adequate substitute for compliance with all of the exit criteria set forth in the Milestone Plan.

3.  The parties hereby stipulate that, upon entry of the Court's order approving the conditions set forth herein, this lawsuit shall be dismissed without prejudice, subject to the Court retaining jurisdiction until December 31, 2008 for purposes of enforcing the terms of this Agreement. The parties further stipulate that, upon entry of an order of dismissal without prejudice, formal monitoring by Plaintiffs and the Court Monitor shall be discontinued. On December 31, 2008, if there are no pending motions for enforcement of the Agreement or orders implementing any remedy requiring continued Court jurisdiction and/or additional performance, the dismissal shall become a dismissal with prejudice, and an Order to that effect may be entered following final approval of the Court. Any portion of the Agreement that is not before the Court as a pending

motion for enforcement of the Agreement or an order requiring continued or additional performance shall expire as a condition of dismissal on December 31, 2008.

4.     The parties further stipulate that neither party shall submit any matter to this Court for resolution between July 1, 2007, and October 1, 2008, with the exception of any disputes that may arise relating to payment of attorneys' fees or costs.

5.     If, after October 1, 2008, Plaintiffs believe that Defendants have violated the material terms and conditions of this Agreement, Plaintiffs shall follow the procedures for notification and negotiation set forth in paragraph 10. If, after following the procedures set forth herein, no resolution is achieved, or if there is an emergency situation as defined in Appendix A, Plaintiffs may file a motion for enforcement of the material terms and conditions of this Agreement and seek such remedies as may be available at law or in equity in the United States District Court for the District of Utah, subject to the limitations set forth below in this paragraph. Defendants further stipulate and agree that Plaintiffs' motion shall be subject to and decided in accordance with Utah law regarding enforcement of settlement or similar agreements, irrespective of whether such violation may be deemed substantive or procedural in nature and irrespective of other federalism or choice of law considerations. Plaintiffs expressly stipulate that Plaintiffs will not file a motion to extend this Agreement beyond December 31, 2008. However, if Plaintiffs file a motion to enforce the terms of the Agreement due to Defendants' alleged non-compliance, the Court may choose to order extension of some or all of the terms of the Agreement as a remedy for non-compliance.

6. Plaintiffs are entitled to reasonable attorneys' fees and costs for their work between September 1, 2006, and June 30, 2007, and for their work between July 1, 2007 and the end of the case. The parties shall attempt to resolve the amount of fees owing. The Court shall retain jurisdiction to resolve disputes and enforce agreements about attorneys' fees and costs.

7. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained herein. The Court's order enforcing this Agreement shall become the controlling order and shall supercede all previous agreements and orders, including the Milestone Plan to the extent it is not expressly incorporated herein. The parties hereby declare and represent that no promise, inducement, or agreement not herein expressed has been made to obtain this Agreement. The parties acknowledge and agree that the terms and conditions of this Agreement are intended to and do create binding obligations and are not merely recitals.

8. If Plaintiffs file a motion to enforce the Agreement, and the Court finds that Defendants are in breach of the Agreement, then the Court may grant such relief as it deems appropriate, including but not limited to specific performance or injunctive relief extending beyond the expiration date for a fixed period of time to be determined by the Court. Any portion of the Agreement that is not before the Court on December 30, 2008, pursuant to either a pending motion for enforcement or an order for relief, shall expire as a condition of dismissal on December 31, 2008.

9. Prior to June 30, 2007, the Division shall enter into a contract with the Child Welfare Policy and Practice Group to complete a comprehensive evaluation of the Division's adherence to this Agreement that will begin in July 2008. By October 31, 2008, the Child Welfare Policy

and Practice Group shall complete this comprehensive evaluation. The evaluation will focus on whether the Division has been able to sustain the mechanisms, systems, and resource allocation set forth in Parts II and III of this Agreement. The methodology for this review is set forth as Appendix B to this Agreement. The study results shall be provided to Defendants, Plaintiffs' counsel, the State QI committees, and to the Governor's Child and Family Cabinet Council.

10. As set forth in paragraph 4, neither party shall submit any matter to this Court for resolution between July 1, 2007, and October 1, 2008 (except disputes relating to attorneys' fees and costs). After October 1, 2008, prior to filing any motion to enforce the Agreement, Plaintiffs shall notify Defendants of their intention to do so. The notice shall be in writing and shall specify the particular provision(s) of the Agreement with which Plaintiffs contend Defendants are not in compliance. The parties shall then have 30 days in which to attempt to resolve any disagreement over compliance. The parties shall work in good faith to resolve any concerns, and can jointly extend the time to resolve the matter if the parties are working towards a solution. If no such agreement is reached within 30 days, if the parties are at an impasse, or if there is an "emergency situation" as defined in Appendix A, then Plaintiffs may file a motion to enforce the Agreement. All reasonable efforts to resolve the alleged non-compliance shall be made prior to filing a motion to enforce the Agreement. If Plaintiffs invoke the "emergency situation" provision (defined in Appendix A), Plaintiffs must provide Defendants with notice, in writing, that they are invoking the provision, and must provide sufficient facts and allegations so that Defendants can be reasonably informed of the circumstances and facts surrounding the alleged emergency situation.

11.     Contemporaneously with the execution of this Agreement, the parties shall file a Joint Motion for Preliminary Approval of Parties' Agreement to Terminate the Lawsuit and Approval of the Process for Providing Notice to Class.  Prior to the Court's scheduled hearing on June 28, 2007, the parties shall jointly file a Motion for Final Approval of the Agreement and to Dismiss the Case Without Prejudice, along with a proposed court order dismissing the case without prejudice in conformity with the terms of the parties' Agreement.  On December 31, 2008, if no enforcement action is pending, this dismissal shall automatically become a dismissal with prejudice following approval of the Court.

12.     The parties hereby stipulate and agree that under Fed. R. Civ. P. 23(e) this Court must approve any settlement or dismissal of this lawsuit.  This Agreement is contingent upon the Court's approval in accordance with the requirements of Rule 23(e).  Defendants agree to pay all reasonable costs and expenses incurred in complying with the requirements of Rule 23(e)**.**  If the Court fails to approve this Agreement, then the Agreement will be void and of no effect and the Milestone Plan and its court-ordered modifications will again have full force and effect.

13.     The parties signing this Agreement represent that the Agreement has been fully, fairly, and honestly negotiated at arms length among experienced counsel; that serious questions of law and fact exist that make the outcome of the litigation uncertain; that they voluntarily agree to compromise and settle their claims to forestall further uncertainty and expense associated with continued litigation; and that they have read this Agreement and fully understand its provisions and agree that it is fair and reasonable.  This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

## PART II

14.     The parties stipulate and agree that the systemic reforms achieved by the parties need to be sustained.  In order to sustain positive outcomes for children and families, the Division agrees to continue operating in accordance with the Milestone Conditions, as defined in Appendix A, until at least December 31, 2010.  The parties stipulate that Defendants' compliance with the terms of this Agreement provide appropriate mechanisms to ensure that the system will sustain positive outcomes for children and families in the absence of on-going federal court oversight and monitoring by Plaintiffs and the Court Monitor.

15.     The Milestone Plan addresses nine different milestones that were to guide the Division's future operations.  Milestones One through Three relate to actions that the Division needed to undertake to lay the foundation for a solid child welfare system.  The parties agree that these milestones have been achieved and need not be expressly incorporated into the parties' Agreement.  The Division's continuing commitment to sustaining the important reform objectives underlying these milestones is instead addressed in sections B through D of Part III below.

16.     Milestone Four establishes "priority focus areas" as they existed in 1999.  The parties agree that these priority focus areas need to be updated.  Accordingly, the Division has consulted with the State QI Committee to identify new areas for priority focus.  These priority areas are: employee retention and recruitment, placement stability, and substance abuse. A strategy for improvement in each of these areas shall be identified in writing prior to June 28, 2007. Progress on these areas shall become part of the Division's quarterly report until December 31, 2010 or

until the focus areas are deemed adequately addressed by the Division with the active participation of the State QI Committee.

17.     Milestone Five addresses accountability mechanisms that were largely in place at the time the Milestone Plan was finalized.  The parties agree that these checks and balances on the system are important, and have set forth in detail in Part III how these accountability structures will operate to ensure sustainability of reforms.

18.     Milestones Six through Nine set forth the Division's commitment to analyze trend data, conduct the Case Process Review (CPR) and the Qualitative Case Review (QCR), and to establish QI committees.  Defendants recognize the importance of sustaining the on-going processes and objectives set forth in these milestones as they have played a pivotal role in the Division's reform of its child welfare system.  Accordingly, the Division has finalized and adopted administrative policy that specifically incorporates the Division's role in carrying out the collection and analysis of trend data, and supporting the CPR, QCR, and QI Committees.  The new policies shall be published on the Department Website and provided to Plaintiffs on or before May 11, 2007.  The Division's role in supporting these important functions shall be substantially the same as in FY 2007, until at least December 31, 2010.

19.     The Office of Services Review shall continue to have responsibility for administering the CPR and the QCR.  OSR shall conduct the CPR on an annual basis and the QCR annually for each region.  OSR shall independently review case transfers and case code changes that occur between the first and second Salt Lake City QCR reviews and take other steps to protect the

integrity of the QCR process, as necessary.  The Department may make changes to the CPR or QCR processes and/or instruments, following the process set forth in paragraph 20.

20. Defendants may propose material changes (as defined in Appendix A) in the policies, practices, and procedures set out in Part II of this Agreement that Defendants believe are necessary and proper for the effective administration of the Division, or are necessary to comply with or implement changes in the law that make it impossible for Defendants to comply with any policy, practice, or procedures contained herein.  If Defendants propose such changes, they shall provide prompt written notice to the State QI Committee. The notification shall include: (a) the proposed change; (b) a summary of the reason for the change; and (c) the proposed date of implementation of the change.  The State QI Committee shall have no fewer than 45 days to comment on the proposed change (the proposed date for implementation must be at least 45 days after the notice is given).  Defendants shall give full, fair, and good faith consideration to all comments and objections received, and shall notify the State QI Committee in writing of their decisions regarding the QI committees' comments and the reasons supporting their decision.  The Division shall provide complete information on all material changes in the policies, practices, and procedures set out in Part II in an appendix to its annual report, which shall be publicly available on its website.

## PART III

21. The parties stipulate and agree that the overarching systemic reform of Utah's child welfare system achieved through the efforts of Defendants, Plaintiffs, and the Court Monitor should be sustained.  Defendants hereby agree to maintain this reformed system by complying

with the requirements set forth in Sections A-F below. These requirements shall be sustained unless and until the Division and/or Department determines with the input of the State QI Committee (or other community partners if this committee no longer exists after December 31, 2010) that a particular requirement is no longer resulting in positive outcomes for children and families, or that there is a new model that would improve upon the systemic reforms. The Division shall provide an explanation for changes to these requirements in its Annual Report, which shall be publicly available on its website.

> **A.  The Division must continue to follow and engage in continuous improvement of the Practice Model and the Guidelines for its implementation.**

22.    Milestone One addresses development of the Practice Model. The Department recognizes that the Practice Model has provided a comprehensive and effective model for positive interaction with children and families.

23.    The Division shall provide appropriate training to all direct service employees on the practice guidelines, and shall ensure that employees are made aware of any changes to the guidelines through practice alerts and on-going training and mentoring. All direct service employees must be informed of, trained on, and employ the Practice Model. Direct service employees shall also be made aware through training and through Division administration that adherence to the Practice Model is mandatory.

24.    The Division shall continuously assess the Practice Model and the practice guidelines, and take steps to improve these case practices for children and families. The Division shall notify the State QI Committee of any material change in the Practice Model and practice

guidelines in accordance with paragraph 20. The Division shall also provide such information in its annual report, which shall be publicly available on its website.

> **B.     The Division must have sufficient financial resources to sustain the infrastructure created by the Milestone Plan and to maintain positive outcomes for Utah's children and families.**

25.     Defendants shall make good faith efforts to ensure that sufficient resources are made available to sustain the reforms and outcomes achieved through this litigation. It is acknowledged by the parties that significant budget cuts will undermine the Division's ability to run its child welfare system. As part of the good faith efforts, the Department shall engage key community stakeholders in its efforts to ensure sufficient financial resources, including but not limited to the Child Welfare Legislative Oversight Panel and the Governor's Child and Family Cabinet Council (described in paragraph 39), by providing information and data as described in section D, and by involving these stakeholders in identifying needs and resources. The Department shall also engage the QI Committees in these efforts and in seeking community investment in the child welfare system.

26.     In order to be deemed sufficient, resources must be adequate to support the continued administration of the quality assurance mechanisms set forth in Milestones 5-9 (or comparable quality assurance mechanisms after December 31, 2010), a trained workforce with a reasonable caseload (as described in Section C), administration and support for the SACWIS system (as described in Section D), and to maintain contract and flexible funding, as defined in Appendix A. The Division shall designate sufficient resources to actualize these commitments.

27.     The Division shall make information on its budget available on the Department website on an annual basis.

        **C.     The Division must continue to make sufficient investments to ensure a trained workforce with a reasonable caseload.**

28.     Defendants recognize that having a trained workforce with a manageable caseload is crucial to sustaining the reforms achieved through this action. In order to maintain these important workforce standards, the Department and/or the Division shall carry out the following:

    (1) The Division shall ensure that all direct service employees receive training in accordance with the requirements of Utah Code § 62A-4a-107 (or its successor statute).

    (2) The Department shall conduct a workload study in Spring 2007. The methodology is attached at Appendix C, and the study's findings shall be posted on the Department website. The Department shall make good faith and continuous efforts to comply with the study's findings.

    (3) The Division shall ensure that supervisor to caseworker ratios are appropriate to ensure adequate supervision and mentoring. Appropriate supervisory ratios will be established by the Division's 2007 workload study.

    (4) The Division shall ensure that trainers have sufficient knowledge and ability to provide appropriate levels of training and support. The Division shall ensure that there are an appropriate number of trainers to comply with the training requirements set forth in Utah Code § 62A-4a-107 (or its successor statute).

    (5) The Department shall continue to monitor caseloads and the correlation between caseload and employee performance.

    (6) The parties stipulate that, at the present time, the appropriate caseload level is 15 cases per worker for CPS and in-home, and 12 cases per worker for foster care. The Division shall make good faith and continuous efforts to maintain these caseload levels or to adjust them if indicated by the workload study.

29. The Division shall provide caseload data to the Child Welfare Legislative Oversight Panel, the Child and Family Cabinet Council, and the state and regional Quality Improvement Committees at least semi-annually. Caseload data shall also be posted on the Department's website and updated at least annually. When material increases in caseload occur (as defined in Appendix A), the Division shall provide a plan to address those increases on its website, linked to the caseload data.

> **D.    The Division must ensure that the child welfare system is transparent, relies on data and quality assurance mechanisms to measure system functioning, and engages in self-critique and analyses to improve practice.**

30. The parties agree that developing and maintaining a well-functioning information system and quality assurance mechanisms have been important factors in reforming Utah's child welfare system. These efforts have allowed the Division to create a more transparent child welfare system and have enabled the Division to engage in self-critique and analysis based on data. Such efforts are key to ensuring that stakeholders and community members have access to accurate data such that evaluation of the child welfare system may be based on actual system performance rather than anecdotal information.

31. In order to ensure that Utah's child welfare system remains transparent, the Department shall ensure that the following actions occur:

> (1) The Division shall continue to operate a statewide automated child welfare information system (SACWIS) equivalent to or better than the current SAFE data system that will track compliance with performance goals whenever possible;
>
> (2) The Office of Services Review shall perform the CPR and QCR annually and issue an annual report, and the Division shall provide support as set forth in more detail in paragraphs 18 and 19, above;

13

(3) The Department shall make the following information available on the Department website as soon as it is practicably available: CPR scores (posted annually), QCR scores for each region (posted annually as regional data is available); workload study results; OSR annual report; the Division quarterly reports (including trend data and caseloads broken down by region); Federal Child and Family Services Review data, including program improvement plans and updates.

(4) If the data collected in the QCR or CPR demonstrate a marked decline in performance (as defined in Appendix A), or if there is a material increase in caseloads (as defined in Appendix A), the Department shall provide an appropriate response in writing within 90 days, which shall be available on the Department website.

(5) The Office of Services Review shall provide information regarding the QCR and CPR results to each QI committee annually, and shall provide reasonably available region specific information as requested by the regional committees. OSR shall also have responsibility for the analysis of system performance data and the identification of areas of concern. Regarding the QCR, OSR shall identify the following trends in its annual report:

1. **Above standards**: For indicators that are above the standards set forth in the Milestone Plan and have either stayed the same or improved;

2. **Improved but below standards**: For indicators that have improved from the previous year but remain below the standards set forth in the Milestone Plan;

3. **Decreased but above standards**: For indicators that have decreased from the past year but remain above the standards set forth in the Milestone Plan;

    4. **Marked decline in performance**: For indicators that have decreased from the past year and the decrease has resulted in a decline of 8.34 percent or more from the standards set forth in the Milestone Plan;[1] and

    5. **Status Quo and below standards**: For indicators that have remained the same and are below the standards set forth in the Milestone Plan.

(6) The Division shall notify Plaintiffs' counsel when the data required in (3) is made available. Defendants shall also provide such information as Plaintiffs may deem necessary or appropriate to monitor and evaluate Defendants' compliance with the parties' Agreement, as long as that information is reasonably ascertainable. This obligation shall continue through December 31, 2010.

(7) In accordance with best practices around the country, trend data shall be analyzed through multiple cohorts, including entry, exit, and point-in-time, depending on which process or combination of processes provides the most reliable methodology for the trends being tracked.

**E.**     **The Division must ensure that there is organized and informed community involvement in the child welfare system and must ensure that there is adequate staff to support such involvement.**

32. The parties agree that QI committees play a crucial function in ensuring the sustainability of reforms by providing for an informed public review of system performance. In order to support this important role, the Division shall commit to the following:

---

[1]. The parties acknowledge that 8.34 percent represents a two case drop from the standards established by the Milestone Plan. If, in the future, the Department changes the sample size, the parties agree to change the percentage rate accordingly to maintain a percentage consistent with a two case drop.

(1) The Division shall provide sufficient staffing for the state and regional committees to ensure adequate membership as discussed in sub-paragraph 3, to assist these committees with data collection and interpretation, to provide detailed information regarding the Division's practice, and to support the QI committees' ability to make recommendations for systemic improvement. OSR shall provide QI committees with data and an analytical framework for that data. When necessary, Division staff shall coordinate with the QI committees to gather additional information from the community.

(2) The Division shall educate the QI committees about the data and information sources used by the Division and the Department annually. QI committee members will be invited to attend QCR reviews, to participate in daylong child welfare practicum (currently referred to as "immersions"), and to shadow workers when appropriate.

(3) The Division shall make reasonable and good faith efforts to recruit at least one GAL or CASA, at least one former foster youth or family member who has been involved with the child welfare system, and at least one foster parent to participate on the state and regional QI Committees. The Division shall make good faith efforts to ensure that the committees reflect the racial diversity of any significant minority of the Division's clients.

(4) The Division shall facilitate the exchange of information among QI committees by supporting a website, and other appropriate information sharing devices. The Division shall also continue the practice of having an annual QI committee summit to assist in the exchange of information and best practices from the regions.

**F.     The Division must maintain sufficient oversight to replace further Federal Court oversight and to demonstrate sufficient indicia of sustainability.**

33. Once federal court oversight concludes, Utah's child welfare system will have sufficient oversight from other entities outside the Division to ensure continued progress and to minimize

system regression.  In addition to the oversight efforts described above, the Department also shall maintain the following processes and entities to ensure systemic monitoring and improvement:

(1) The Department shall continue to provide staffing and administrative support for the Office of Child Protection Ombudsman and the Child Fatality Review Committee. These entities play a vital role in monitoring the child welfare system, responding to system challenges or failures, and preventing systemic problems.

(2) The Department's Executive Director's Office and executive leadership team shall continue to provide input and assistance.

(3) The Department shall continue to provide administrative support for the handling of individual complaints, and will work with the Governor's office to resolve constituent complaints received by that office.

(4) The Division shall continue to provide technical assistance and support to the regions through the use of practice improvement teams and OSR, at least through December 30, 2010.

(5) The Division shall comply with the Federal Administration on Children and Families' Federal Child and Family Services Review. These reviews will provide state specific and comparative data on the Division's performance. Results from the Reviews will be available on the Department Website.

34. The Department shall also provide information on system performance to entities that provide direct oversight of the child welfare system, including information regarding performance areas where there has been a marked decline in performance or if there has been a material increase in caseload as defined in Appendix A.  This information shall be publicly available on the Department website, and shall be presented (either orally or in writing) to the following entities at least annually: the DCFS Board, the QI Committees, the Child Welfare Legislative Oversight Panel, and the Governor's Child and Family Cabinet Council.  Information

that shall be provided includes, but is not limited to: CPR and QCR results, DCFS quarterly and annual reports, OCPO reports, Child Fatality Review Annual Report reports, and the Foster Care Citizen Review Board Annual Report, as long as such committees exist.

35. The Department shall continue to provide performance information to and collaborate with outside entities who share systemic concerns, including but not limited to: the Drug Endangered Children panels, the YWCA, the Standing Committee on Child and Family Law administered by the Judicial Council, the Board of Juvenile Court Judges, the Court Improvement Project, the Guardian *ad litem's* Office, and Voices for Utah Children. The Department anticipates that these entities will provide another level of system review. If appropriate, the Department will engage some of these entities in supporting the Department's request for Division funding.

36. The Department shall provide information and testimony to the Child Welfare Legislative Oversight Panel at least annually on the safety and well being of Utah's children, and shall provide testimony to other committees and sub-committees of the Utah Legislature as requested.

37. The Division shall work with the local institutions of higher education to maintain an appropriately educated workforce and, when appropriate, shall use the institutions' resources for research, independent review of system performance, and to study areas where the Division has experienced a marked decline in performance.

38. The Department shall continue to invite community leaders to participate in daylong child welfare practicum (currently referred to as "immersions") until at least June 30, 2008.

39.     Upon the entry of this Agreement, by executive order the Governor of Utah shall establish a Child and Family Cabinet Council. The Child and Family Cabinet Council shall issue recommendations regarding resource allocation to maintain positive outcomes for children in Utah's child welfare system. The parties understand that this Council is established and serves solely at the recommendation of the Governor's Office.

Dated this 11th day of May 2007.

/s/ Leecia Welch_____
Leecia Welch
National Center for Youth Law
Attorney for Plaintiffs
Signature approved orally, hard copy to follow

/s/ Susan Eisenman_____
Susan Eisenman, Assistant Attorney General
for the State of Utah
Attorney for Defendants

Approved as to form:

| | |
|---|---|
| /s/ Paul Vincent _____ | /s/ Lisa-Michele Church_____ |
| Paul Vincent, | Lisa-Michele Church |
| Child Welfare Policy and Practice Group | Executive Director, Department |
| Birmingham, Alabama | Of Human Services, State of |
| Court Monitor | Utah |
| Signature on file with the filer | Signature on file with the filer, |
| Any may be reviewed during | and may be reviewed during |
| Normal business hours | normal business hours |